UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DIANA PEREZ,<br><br>          Plaintiff,<br><br>          -*versus*-<br><br>MY IDEAL PROPERTY, INC., RON BOROVINSKY, ISAAC ARONOV, ISKYO ARONOV, MOISEY ISKHAKOV, MICHAEL HELETZ, MICHAEL GENDIN, LL FUND, INC., LL ORGANIZATION, INC., PHASE 2 DEVELOPMENT LLC, IA INVESTORS, LLC, MIP PARTNERS LLC, MY IDEAL PROPERTY GROUP LLC, MY IDEAL PROPERTY ROCKAWAY BLVD LLC, MIP MANAGEMENT INC., SETTLE NY CORP, AND AFFILIATE ENTITIES 1-1000,<br><br>          Defendants. | 16-CV-4853<br>(Brodie, J.)<br>(Pollak, M.J.) |
| UNITED STATES OF AMERICA,<br><br>          Plaintiff-Intervenor,<br><br>          -*versus*-<br><br>ISKYO ARONOV, RON BOROVINSKY, MICHAEL KONSTANTINOVSKIY, 175 VERNON AVE INC, 308 LINDEN ST LLC, 752 MANAGEMENT LLC, 1021 B HOLDINGS LLC, 1083 LAFAYETTE AVENUE, LLC, 1178 GATES AVE INC, 2320 BAEUMONT AVE UNIT 3D LLC, 1S8C HOLDINGS LLC, AG2 EQUITIES, INC., ARBIE MANAGEMENT INC., BEDSTUY GROUP LLC, BERT HOLDINGS LLC, BNE MANAGEMENT LLC, ETUY EQUITIES LLC, IA INVESTORS LLC, IJ DEVELOPMENT LLC, LL FUND INC., LL ORGANIZATION INC., MI 1 HOLDINGS LLC, MIP MANAGEMENT INC., MY IDEAL PROPERTY GROUP LLC, MY IDEAL PROPERTY ROCKAWAY BLVD | **COMPLAINT-IN-INTERVENTION OF THE UNITED STATES OF AMERICA AND <u>DEMAND FOR JURY TRIAL</u>** |

LLC, NATIONAL HOMEOWNERS
ASSISTANCE INC., PHASE 2
DEVELOPMENT LLC, PIM EQUITIES
INC., SETTLE NY CORP, ZOR EQUITIES
LLC, AND ZT EQUITIES LLC

Defendants.

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

PARTIES ...................................................................................................................................4

JURISDICTION AND VENUE ...............................................................................................13

STATUTORY BACKGROUND ..............................................................................................15

FACTUAL BACKGROUND....................................................................................................17

    A. The FHA Pre-Foreclosure Sale Program................................................................ 17

    B.  Representations Made By Parties To A PFS ........................................................... 18

    C.  Defendants' Scheme to Defraud............................................................................... 21

EXEMPLAR FRAUDULENT SHORT SALES BY DEFENDANTS .....................................25

    I.    123 Halsey Street, Brooklyn, New York, 11216 .................................................25

    II.    1178 Gates Avenue, Brooklyn, New York, 11216 ...........................................29

    III.    175 Vernon Avenue, Brooklyn, New York 11206 .........................................32

    IV.    1083 Lafayette Avenue, Brooklyn, New York, 11221 ...................................36

    V.    216-35 111th Ave, Queens Village, New York, 11429 ...................................39

    VI.    181 Schaefer Street, Brooklyn, New York, 11207....................................42

    VII.   629A Madison Street, Brooklyn, New York 11221 ..........................................45

    VIII.  391 Montauk Ave, Brooklyn, New York 11208...............................................49

    IX.    997 Clarkson Avenue, Brooklyn, New York 11212 .......................................53

    X.    30 Melba Court, Brooklyn, New York 11229....................................................55

CLAIMS FOR RELIEF ...........................................................................................................58

DEMAND FOR JURY TRIAL ................................................................................................61

Plaintiff the United States of America, by its attorney, Seth D. DuCharme, Acting United States Attorney for the Eastern District of New York, and Michael J. Castiglione, Assistant United States Attorney, having filed a notice of intervention pursuant to 31 U.S.C. § 3730(b)(4), alleges for its Complaint-in-Intervention as follows:

## INTRODUCTION

1.      From at least 2013 through 2016, Iskyo Aronov, Ron Borovinsky, and Michael Konstantinovskiy (the "Individual Defendants"), together with other co-conspirators, engaged in a fraudulent "short sale" scheme involving numerous residential properties located in the Eastern District of New York with mortgages insured by the Federal Housing Administration ("FHA") of the United States Department of Housing and Urban Development ("HUD").

2.      The Individual Defendants utilized various corporate entities in furtherance of their fraudulent scheme, including but not limited to the "Corporate Defendants" (and together with the Individual Defendants, "Defendants") named in this Complaint.[1]

3.      In an FHA-insured mortgage, FHA insured the mortgage lender (also known as the "mortgagee") against default by the borrower (also known as the "mortgagor").

4.      Under its Pre-Foreclosure Sale ("PFS") Program (the "PFS Program"), HUD permits the mortgagee to offer a qualifying homeowner with an FHA-insured mortgage that was

---

[1] The "Corporate Defendants" are 175 Vernon Ave Inc, 308 Linden St LLC, 752 Management LLC, 1021 B Holdings LLC, 1083 Lafayette Avenue, LLC, 1178 Gates Ave Inc, 2320 Baeumont Ave Unit 3D LLC, 1S8C Holdings LLC, AG2 Equities, Inc., Arbie Management Inc., Bedstuy Group LLC, Bert Holdings LLC, BNE Management LLC, Etuy Equities LLC, IA Investors LLC, IJ Development LLC, LL Fund Inc., LL Organization Inc., MI 1 Holdings LLC, MIP Management Inc., My Ideal Property Group LLC, My Ideal Property Rockaway Blvd LLC, National Homeowners Assistance Inc., Phase 2 Development LLC, PIM Equities Inc., Settle NY Corp, Zor Equities LLC, and ZT Equities LLC.

in default to avoid foreclosure and sell the property for fair market value, but less than the balance of the mortgage, in a transaction referred to as a "PFS" or "short sale."

5.      If the short sale met HUD requirements, the mortgagee (or servicer of the mortgage, acting on behalf of the mortgagee) would release the mortgage and submit a claim to HUD for FHA insurance to cover, among other things, the difference between the proceeds from the short sale received by the mortgagee and the outstanding indebtedness on the mortgage.  HUD, in turn, would pay the insurance claim from federal funds.

6.      At all relevant times, HUD had statutory and regulatory authority only to pay an FHA insurance claim for a short sale where, among other conditions, the mortgagee received an amount at least equal to the current fair market value of the property, less adjustments HUD deemed appropriate, in the short sale.  12 U.S.C. § 1710(a)(1)(D); 24 C.F.R. § 203.370(a).

7.      In accordance with industry practice and HUD requirements, to show that the transaction was arm's-length and the sale price reflected fair market value, the parties to a short sale (including the seller, buyer, and their agents) made various certifications in an "Arm's Length Affidavit" or "Pre-Foreclosure Sale Addendum."  Such certifications typically included, among other things, that: (1) the sale was an "arm's length" transaction between unrelated parties; (2) the transaction was characterized by a selling price and other conditions that would prevail in an open market environment; (3) there were no hidden terms or special understanding existing between any of the parties involved in the transaction; (4) there were no higher offers for the property that had not been disclosed to the mortgagee; and (5) the seller would not receive any funds or commissions from the sale of the property that were not approved by the mortgagee.

8.      Here, Defendants engaged in a multi-year scheme involving dozens or more fraudulent short sales of residential properties in the Eastern District of New York, many with FHA-insured mortgages.

9.      Specifically, Defendants and their co-conspirators targeted numerous property owners with financially distressed mortgages who could serve as purported sellers in fraudulent short sales conducted by Defendants.  After establishing contact with such property owners, Defendants or their agents would offer those property owners thousands of dollars – with some amount paid up front and the remainder paid at closing of the short sale.  In exchange, Defendants required the property owners to sign over their "deeds" to the property to Defendants, or to sign a contract of sale with Defendants (or one of their shell companies), long before HUD or the servicer had even approved a short sale of the property.  These deeds and contracts gave Defendants a means to exercise undue control over the purported sellers and the short sale process.  Through such control, Defendants effectively prevented the servicer from receiving any higher offers from other prospective purchasers in the short sale.

10.     After acquiring the deed to the property or a contract of sale, Defendants assigned "agents" to the purported seller, who sought approval from the servicer for the short sale and falsely claimed to market the properties in the sales.  In reality, the seller's "agents" worked for Defendants.  Those agents did not market the properties in the short sales in a *bona fide* fashion, but instead conspired to sell the properties to Defendants for as low a price as possible.   At times, Defendants secretively "flipped" the properties to other purchasers at or around the dates of closing of the short sales, for higher prices than the nominal short sale prices, in pre-arranged sales.  Defendants executed such flips by secretively transferring shares in the corporate entities that nominally acquired the properties in the short sale.

11.     In the process of seeking approval for and closing of the short sale, Defendants or their co-conspirators made a variety of misrepresentations to conceal the non-arm's length nature of the transaction and the fact that the sale price did not reflect a *bona fide* marketing process or fair market value.  For instance, Defendants and their co-conspirators – acting in these short sales as seller's agent and listing broker, buyer's broker, and buyer – made several material misrepresentations in the "Arm's-Length Affidavit" or "Pre-Foreclosure Sale Addendum" executed at or around the date of closing of each transaction.

12.     As a result of Defendants' fraudulent scheme, Defendants acquired the properties for sale prices that did not reflect fair market value, while fraudulently inducing servicers or mortgagees to release the mortgages in the short sales and submit unwarranted claims to HUD for FHA insurance.  HUD, in turn, paid those claims from FHA funds.

13.     The United States of America brings this civil fraud action against Defendants for treble damages and civil penalties under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729 *et seq.*; and civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a.

## PARTIES

14.     Plaintiff is the United States of America.

15.     At relevant times, Defendant Iskyo Aronov (also known as Isaac Aronov) ("Aronov") resided in Middle Village, New York.  Aronov was the founder, Chief Executive Officer, and President of Defendants My Ideal Property, Inc., My Ideal Property Group LLC, and MIP Management Inc. (together, the "My Ideal Property Defendants"), and also owned or controlled other affiliated entities.  Aronov was also a member of, owned, or controlled numerous other corporate entities, which he established to help him fraudulently acquire residential

properties through short sales; to mask his identity as the beneficial owner of such properties; and to disguise subsequent transfers of beneficial interests in such properties.

16.     At relevant times, Defendant Ron Borovinsky ("Borovinsky") resided in Hollis Hills, New York.  Borovinsky identified himself on LinkedIn as a co-founder of My Ideal Property in 2007 with Aronov.  Borovinsky described My Ideal Property as a "real estate investment firm specializing in turning around defaulted and fraudulent transactions in NYC.  Mainly focusing on 1-6 family homes, we negotiate the sellers [*sic*] loans/debt, evict non-paying problematic tenants, litigate title issues, purchase, renovate and resell homes."  Borovinsky further claimed that, as of mid-2016, "My Ideal Property has now closed on more than $250MM in flipped transactions and anticipates reaching $425MM by 2017."  In several fraudulent short sales, Borovinsky purported to act as broker for the purchaser, through his corporation, Arbie Management Inc.  Together with others, Borovinsky conspired to fraudulently obtain properties through sham short sales.

17.     At relevant times, Defendant Michael Konstantinovskiy (also known as Michael Kay) ("Konstantinovskiy") resided in Roslyn Heights, New York.  Konstantinovskiy worked as a My Ideal Property agent, where he, together with others, conspired to fraudulently obtain properties through sham short sales.  In several fraudulent short sales, Konstantinovskiy purported to act as listing agent and broker for the seller, using the corporate entities National Homeowners Assistance and Settle NY Corp.  Together with others, Konstantinovskiy conspired to fraudulently obtain properties through sham short sales.

18.     The Individual Defendants utilized various corporate entities in furtherance of the fraudulent short sale scheme, including but not limited to the Corporate Defendants identified below.  The Individual Defendants caused the Corporate Defendants to be incorporated or

organized.  At relevant times, the Corporate Defendants were owned or controlled by one or more of the Individual Defendants.

19.     Defendant 175 Vernon Ave Inc, a New York corporation, was incorporated on or about October 21, 2013 by an individual referred to herein as "Co-Conspirator 1," an attorney who, together with others, conspired to fraudulently obtain properties through sham short sales.  175 Vernon Ave Inc's Certificate of Incorporation identified the corporation's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the corporation as P.O. Box 750456, Forest Hills, NY 11375.  At the time of 175 Vernon Ave Inc's incorporation, P.O. Box 750456, Forest Hills, NY 11375 was registered to an individual referred to herein as "Co-Conspirator 2."  At relevant times, Co-Conspirator 2 worked as a My Ideal Property agent, where he, together with others, conspired to fraudulently obtain properties through sham short sales.

20.     Defendant 308 Linden St LLC, a New York limited liability company, was organized on or about June 3, 2013 by Co-Conspirator 1.  The Articles of Organization of 308 Linden St LLC identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as P.O. Box 750456, Forest Hills, NY 11375.  At the time of 308 Linden St LLC's organization, P.O. Box 750456, Forest Hills, NY 11375 was registered to Co-Conspirator 2.

21.     Defendant 752 Management LLC, a New York limited liability company, was organized on or about June 2, 2014.  The New York Department of State, Division of Corporations Entity Information database identified "[an individual referred to herein as 'Co-Conspirator 3'] 160-23 Rockaway Blvd, Ste 117, Jamaica, New York, 11434" as the address to which the Department of State will mail process if accepted on behalf of the entity.  At relevant times, Co-

6

Conspirator 3 worked as a My Ideal Property agent, where he, together with others, conspired to fraudulently obtain properties through sham short sales.

22.     Defendant 1021 B Holdings LLC was a New York limited liability company.  The New York Department of State, Division of Corporations Entity Information database identified "Iskyo Aronov, 84-28 63rd Ave, Middle Village, New York, 11379" as the address to which the Department of State will mail process if accepted on behalf of the entity.

23.     Defendant 1083 Lafayette Avenue, LLC, a New York limited liability company, was organized on or about August 22, 2013 by Co-Conspirator 1.  The company's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as P.O. Box 750456, Forest Hills, NY 11375.  At the time of 1083 Lafayette Avenue, LLC's organization, P.O. Box 750456, Forest Hills, NY 11375 was registered to Co-Conspirator 2.

24.     Defendant 1178 Gates Ave Inc, a New York corporation, was incorporated on or about September 20, 2013 and dissolved on or about October 26, 2016.  The New York Department of State, Division of Corporations Entity Information database identified "1178 Gates Ave Inc, P.O. Box 750456, Forest Hills, New York, 11375" as the address to which the Department of State will mail process if accepted on behalf of the entity.   At the time of 1178 Gates Ave Inc's incorporation, P.O. Box 750456, Forest Hills, NY 11375 was registered to Co-Conspirator 2.

25.     Defendant 2320 Baeumont Ave Unit 3D LLC, a New York limited liability company, was organized on or about March 17, 2014 by an individual referred to herein as "Co-Conspirator 4."  The company's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as "[Co-Conspirator 4], 118-60 218 Street, Cambria Heights,

NY 11411." At relevant times, Co-Conspirator 4 worked as an employee of My Ideal Property, where he, together with others, conspired to fraudulently obtain properties through sham short sales.

26.     Defendant 1S8C Holdings LLC, a New York limited liability company, was organized by Refoilio Holdings LLC on or about March 14, 2016. 1S8C Holdings LLC's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as "Refoilio Holdings LLC, 116-55 Queens Blvd, Ste 206, Forest Hills, NY 11375." At the time of its organization, 1S8C Holdings LLC's address (116-55 Queens Blvd, Ste 206, Forest Hills, NY 11375) was the same office address used by MIP Management Inc., a corporation controlled by Aronov.

27.     Defendant AG2 Equities, Inc. a New York corporation, was organized on or about May 15, 2013, and dissolved on or about October 26, 2016. At relevant times, AG2 Equities, Inc. was owned or controlled by Aronov. The New York Department of State, Division of Corporations Entity Information database identified "AG2 Equities, Inc., P.O. Box 150057, Kew Gardens, New York, 11415" as the address to which the Department of State will mail process if accepted on behalf of the entity. At the time of AG2 Equities, Inc.'s incorporation, P.O. Box 150057, Kew Gardens, New York, 11415, was registered to Aronov.

28.     Defendant Arbie Management Inc., a New York corporation, was organized on or about April 17, 2007, and dissolved on or about January 25, 2012. At relevant times, Arbie Management Inc. was owned or controlled by Borovinsky. The New York Department of State, Division of Corporations Entity Information database identified "Arbie Management Inc., Ground

Entrance, 65-14 108th Street, Forest Hills, New York, 11375" as the address to which the Department of State will mail process if accepted on behalf of the entity.

29.     Defendant Bedstuy Group LLC, a New York limited liability company, was organized on or about June 11, 2013 by Co-Conspirator 1.  Bedstuy Group LLC's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process against the company as P.O. Box 750456, Forest Hills, NY 11375.  At the time of Bedstuy Group LLC's organization, P.O. Box 750456, Forest Hills, NY 11375 was registered to Co-Conspirator 2.

30.     Defendant Bert Holdings LLC, a New York limited liability company, was organized by an individual referred to herein as "Co-Conspirator 5," on or about July 24, 2014.  Bert Holdings LLC's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process against the company as " [Co-Conspirator 5], PO Box 200595, South Ozone Park, NY 11420."  At relevant times, Co-Conspirator 5 worked as a My Ideal Property agent, where he, together with others, conspired to fraudulently obtain properties through sham short sales.

31.     Defendant BNE Management LLC, a New York limited liability company, was organized on or about September 16, 2015.  The New York Department of State, Division of Corporations Entity Information database identified "[an individual referred to herein as 'Co-Conspirator 6'], P.O. Box 747912, Rego Park, New York, 11374" as the address to which the Department of State will mail process if accepted on behalf of the entity.  At relevant times, Co-Conspirator 6 worked as a My Ideal Property agent, where he, together with others, conspired to fraudulently obtain properties through sham short sales.

32.     Defendant Etuy Equities LLC, a New York limited liability company, was organized on or about March 11, 2015.  The New York Department of State, Division of Corporations Entity Information database identified "Ron Borovinsky, 204-17 Hillside Ave, Ste 328, Hollis, New York, 11423" as the address to which the Department of State will mail process if accepted on behalf of the entity.

33.     Defendant IA Investors LLC, a New York limited liability company, was organized on or about December 21, 2011 by an individual referred to herein as "Co-Conspirator 7", an attorney who, together with others, conspired to fraudulently obtain properties through sham short sales.  IA Investors LLC's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process against the company as "[Co-Conspirator 7], Esq., 16 Paddock Road, White Plains, New York 10605."

34.     Defendant IJ Development LLC, a New York limited liability company, was organized on or about June 14, 2011 by Co-Conspirator 7.  IJ Development LLC's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process against the company as "Iskyo Aronov at 116-55 Queens Blvd, Forest Hills, NY 11376."

35.     Defendant LL Fund Inc., a New York corporation, was incorporated by Aronov on or about February 8, 2012.  The corporation's Certificate of Incorporation identified the corporation's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the corporation as 116-55 Queens Blvd., Forest Hills, New York 11375.

10

36.     Defendant LL Organization Inc., a New York corporation, was incorporated by Aronov on or about September 9, 2010.  The New York Department of State, Division of Corporations Entity Information database identified Iskyo Aronov as the Chief Executive Officer of the corporation and "LL Organization Inc., 116-55 Queens Boulevard, #206, Forest Hills, New York, 11375" as the principal executive office and address to which the Department of State will mail process if accepted on behalf of the corporation.

37.     Defendant MI 1 Holdings LLC, a New York limited liability company, was organized on or about May 21, 2014 by Co-Conspirator 3.  The company's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as "[Co-Conspirator 3], 61-15 98th Street, Apt 15M, Rego Park, NY 11374."

38.     Defendant MIP Management Inc., a New York corporation, was incorporated on or about March 11, 2013 by Aronov.  The corporations' Certificate of Incorporation identified the corporation's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the corporation as 116-55 Queens Blvd., Ste. 206, Forest Hills, New York 11375.

39.     Defendant My Ideal Property Group LLC, a New York limited liability company, was organized on or about December 24, 2015 by Aronov.  The company's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as "Iskyo Aronov, 84-28 63rd Ave, Middle Village, New York 11379."

40.     Defendant My Ideal Property Rockaway Blvd LLC, a New York limited liability company, was organized on or about June 20, 2014 by an individual referred to herein as "Co-

11

Conspirator 8." At relevant times, Co-Conspirator 8 worked as a My Ideal Property agent, where he, together with others, conspired to fraudulently obtain properties through sham short sales. The company's Articles of Organization identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as "[Co-Conspirator 8], 142-58 Rockaway Blvd, South Ozone Park, New York 11436."

41. Defendant National Homeowners Assistance Inc., a New York corporation, was incorporated on or about November 30, 2012 by Konstantinovskiy. The corporation's Certificate of Incorporation identified its office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the corporation as "6135 98th St., Apt. 2C, Rego Park, New York 11374."

42. Defendant Phase 2 Development LLC, a New York limited liability company, was organized by Co-Conspirator 7 on or about June 14, 2011. The Articles of Organization of Phase 2 Development LLC identified the company's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as "Iskyo Aronov at 116-55 Queens Blvd, Forest Hills, NY 11376."

43. Defendant PIM Equities Inc., a New York corporation, was incorporated on or about February 13, 2013 by Aronov. PIM Equities Inc.'s certificate of incorporation identified the corporation's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process served on the corporation as "P.O. Box 150057, Kew Gardens, NY 11415."

44. Defendant Settle NY Corp, a New York corporation, was incorporated on or about July 3, 2015 by Konstantinovskiy. Settle NY Corp's Certificate of Incorporation identified the

corporation's office as located in Queens, New York, and the address to which the Secretary of State shall mail a copy of any process against the corporation as "Settle NY Corp, 64-31 108th St., #1222, Forest Hills, NY 11375."  In or about 2016, National Homeowners Assistance Inc. began doing business as Settle NY Corp.

45.     Defendant Zor Equities LLC was a New York limited liability company.  The New York Department of State, Division of Corporations Entity Information database identified "[an individual referred to herein as 'Co-Conspirator 9'], 76-15 166th Street, Fresh Meadows, New York, 11366" as the address to which the Department of State will mail process if accepted on behalf of the entity.  At relevant times, Co-Conspirator 9 worked as a My Ideal Property agent where he, together with others, conspired to fraudulently obtain properties through sham short sales.

46.     Defendant ZT Equities LLC, a New York limited liability company, was organized on or about August 22, 2014 by an individual referred to herein as "Co-Conspirator 10."   At relevant times, Co-Conspirator 10 worked as a My Ideal Property Agent, where he, together with others, conspired to fraudulently obtain properties through sham short sales.  The company's Articles of Organization identified the company's office as located in Nassau, New York, and the address to which the Secretary of State shall mail a copy of any process served on the company as "[Co-Conspirator 10], 248 Forest Drive, Jericho, NY 11753."

## JURISDICTION AND VENUE

47.     This Court has jurisdiction over this action pursuant to 12 U.S.C. § 1833a(e), 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3730(a) and 3732(a).

48.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

49.     Venue is also proper in this District under 28 U.S.C. § 1395 because this is a civil proceeding for the recovery of a pecuniary fine or penalty, the pecuniary fine or penalty accrued in this District, and Defendants are found in this District.

50.     Venue is also proper in this District under 31 U.S.C. § 3732(a) because this is an action brought under 31 U.S.C. § 3730, at least one of the Defendants resides or transacts business in this District, and the Defendants committed acts proscribed by 31 U.S.C. § 3729 in this District.

51.     The Individual Defendants are each subject to personal jurisdiction in New York. At relevant times, the Individual Defendants resided in New York, transacted business in New York, including by conducting real estate transactions involving properties located in New York, and committed fraudulent acts in New York.   Substantially all of the events, actions, representations, and omissions alleged herein relating to Defendants' fraudulent short sales occurred in New York.

52.     The Corporate Defendants are each subject to personal jurisdiction in New York. The Corporate Defendants were all incorporated or organized under New York law, and headquartered in New York.  At relevant times, the Corporate Defendants transacted business in New York, including by nominally acting in real estate transactions involving properties located in New York.  The Corporate Defendants also committed fraudulent acts in New York.

## STATUTORY BACKGROUND

**A.      The False Claims Act**

53.      The FCA provides liability for any person who (i) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [to the United States];" (ii) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim [to the United States];" or (iii) "conspires to commit a violation of [(i) or (ii), among others]."  31 U.S.C. §§ 3729(a)(1)(A), (B), (C).

54.      For purposes of the FCA, the terms "knowing" and "knowingly":

"(A) mean that a person, with respect to information—
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and
(B) require no proof of specific intent to defraud"

31 U.S.C. § 3729(b)(1).

55.      The standard of proof under the FCA is a preponderance of the evidence.  31 U.S.C. § 3731(d).

56.      A person who violates the FCA is "liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1).

**B.      The Financial Institutions Reform, Recovery, & Enforcement Act**

57.      FIRREA provides liability for civil penalties for any person who violates, or conspires to violate, certain predicate criminal offenses.  12 U.S.C. § 1833a.  The standard of proof is a preponderance of the evidence.  *Id.* (f).

58.      The predicate criminal offenses under FIRREA include, as relevant here:

a. <u>18 U.S.C. § 1001 (False Statements Within the Jurisdiction of the U.S.
Affecting a Federally Insured Financial Institution)</u>, which proscribes any
person "in any matter within the jurisdiction of the [executive branch of the
United States]" from "knowingly and willfully … mak[ing] any materially
false, fictitious, or fraudulent statement or representation" or "mak[ing] or
us[ing] any false writing or document knowing the same to contain any
materially false, fictitious, or fraudulent statement or entry . . . ." To constitute
a violation of FIRREA, a violation of 18 U.S.C. § 1001 must "affect[] a
federally insured financial institution." 12 U.S.C. § 1833a(c)(2); and

b. <u>18 U.S.C. § 1343 (Wire Fraud Affecting a Federally Insured Financial
Institution)</u>, which proscribes the use of "wire . . . in interstate or foreign
commerce" for the purpose of executing, or attempting to execute, "[a] scheme
or artifice to defraud, or for obtaining money or property by means of false or
fraudulent pretenses, representations, or promises . . . ." To constitute a
violation of FIRREA, a violation of 18 U.S.C. § 1343 must "affect[] a federally
insured financial institution." 12 U.S.C. § 1844a(c)(2).

59.    A person who violates predicate offenses under FIRREA is liable to the United
States for a civil penalty in an amount assessed by the court in a civil action. 12 U.S.C. § 1833a(a).
If any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss
to a person other than the violator, a civil penalty may be assessed up to the amount of such gain
or loss. 12 U.S.C. § 1833a(b)(3)(A).

## FACTUAL BACKGROUND

**A.     The FHA Pre-Foreclosure Sale Program**

60.     At all relevant times, the Federal Housing Administration ("FHA") was an agency of the United States Department of Housing and Urban Development ("HUD"), an Executive department.

61.     Under the National Housing Act, FHA offered various mortgage insurance programs to homebuyers.  Through these programs, FHA insures approved mortgage lenders (mortgagees) against losses on mortgage loans made to buyers (mortgagors) of single-family housing.  12 U.S.C. § 1709.  FHA collects mortgage insurance premiums from mortgagees for insured loans, using the premiums to replenish FHA's Mutual Mortgage Insurance Fund and reduce FHA's exposure in the operation of its programs.

62.     FHA mortgage insurance was meant to meet the housing needs of creditworthy low-income and moderate-income borrowers who might otherwise not be able to meet conventional underwriting guidelines.  FHA incentivized mortgagees to lend to these borrowers by insuring the mortgagee's loans, helping qualified low-income and moderate-income families become homeowners.

63.     At all relevant times, under its Pre-Foreclosure Sale ("PFS") Program, HUD permitted mortgagees to offer qualifying defaulted mortgagors the opportunity to avoid foreclosure by selling the properties for fair market value, but less than the balance of the associated mortgages, in a transaction referred to as a "PFS" or "short sale."

64.     In a PFS, the proceeds from the short sale were applied to the outstanding mortgage balance that the mortgagor owed the mortgagee.  The mortgagee released the mortgage lien on the property, while often also agreeing to release any obligation of the borrower under the note to repay the remaining mortgage balance.

65.    Following the closing of the PFS, the mortgagee (or servicer that serviced the mortgage on behalf of the mortgagee) then submitted a claim to HUD for payment of FHA insurance.  FHA, in turn, paid federal funds to reimburse the mortgagee for the mortgage balance not covered by the short sale proceeds, as well as for approved costs and expenses, and debenture interest.

66.    HUD had the statutory and regulatory authority to pay claims for short sales only where, among other conditions, the mortgagee received an amount at least equal to fair market value of the property, less adjustments HUD deemed appropriate, in the short sale.  12 U.S.C. § 1710(a)(1)(D) ("The Secretary may pay insurance benefits upon the sale of the mortgaged property by the mortgagor after default . . . [if, *inter alia*] the sale of the mortgaged property has been approved by the Secretary [and] the mortgagee receives an amount at least equal to fair market value of the property (with appropriate adjustments), as determined by the Secretary . . . ."); 24 C.F.R. § 203.370(a) ("HUD will pay FHA insurance benefits to mortgagees in cases where, in accordance with all regulations and procedures applicable to pre-foreclosure sales, the mortgaged property is sold by the mortgagor, after default and prior to foreclosures, at its current fair market value (less adjustments as the Commissioner may deem appropriate) but for less than the mortgage currently outstanding.").

### B.    Representations Made By Parties To A PFS

67.    In accordance with industry practice for short sales, as a condition to approval and closing of a PFS, HUD and the mortgagee required the parties to make various sworn certifications in a document provided to the servicer, often referred to by such names as a "Short Sale Affidavit," "Arm's Length Affidavit," or "Pre-Foreclosure Sale Addendum."  The "PFS Addendum" (as such document will be referred to herein) was typically signed by the seller, buyer, agents, and brokers, among possibly other parties to the transaction.

68.     In keeping with its statutory and regulatory authority, HUD (and the mortgagee) required the certifications in the PFS Addendum to establish that the transaction met PFS Program requirements, including that the transaction was arm's length, and the sales price was for fair market value.

69.     During the relevant period, the PFS Addendum typically included representations such as the following:

a.      The sale of the Property is an arm's length transaction, between Seller(s) and Buyer(s) who are unrelated and unaffiliated by family, marriage, or commercial enterprise.  Additionally, the transaction is characterized by a selling price and other conditions that would prevail in an open market environment and there are no hidden terms or special understandings that exist between any of the parties involved in the transaction including, but not limited to the buyer, seller, appraiser, broker, sales agent (including, but not limited to the listing agent and buyer's agent), closing agent and mortgagee;

b.      Any relationship or affiliation by family, marriage, or commercial enterprise to the Seller(s) or Buyer(s) by other parties involved in the sale of the Property has been disclosed to the Mortgagee;

c.      Neither the Seller(s) nor the Buyer(s) will receive any funds or commissions from the sale of the Property except that the Seller(s) may receive a payment if it is offered by the Mortgagee, and, if the payment is made at closing of the sale of the Property, reflected on the HUD-1 Settlement Statement;

d.      There are no agreements, understandings, current or pending higher offers, or contracts relating to the current sale or subsequent sale of the Property that have not been disclosed to the Mortgagee;

e.      The current sale transaction is a market real estate transaction, and the buyer is making an outright purchase of real property;

f.      All amounts to be paid to any person or entity, including holders of other liens on the Property, in connection with the pre-foreclosure sale have been disclosed to and approved by the Mortgagee and will be reflected on the HUD-1 Settlement Statement;

g.      The Listing Agent and Listing Broker certify that the subject property was initially listed in the Multiple Listing Service (MLS) for a period of 15 calendar days before any offers were evaluated; and

        h.      If multiple offers were under consideration at the time the offer was submitted for acceptance, the Listing Agent and Listing Broker certify that, of all the offers meeting HUD's guidelines, this offer yielded the highest net return.

70.      In the PFS Addendum, the parties also expressly acknowledged the importance of these representations, through certifications like the following:

        a.      Each signatory also understands, agrees and intends that the Lender, FHA, HUD, and/or any Investor of the subject Mortgage are relying upon the statements made in the affidavit as consideration for the reduction of the payoff amount of the Mortgage and agreement to the sale of the Mortgaged Premises;

        b.      A signatory who makes a negligent or intentional misrepresentation agrees to indemnify the Mortgagee for any and all loss resulting from the misrepresentation including, but not limited to, repayment of the amount of the reduced payoff of the Mortgage; and

        c.      Each signatory certifies that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate. HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties (18 U.S.C. §§ 1001, 1010, and 1012; 31 U.S.C. §§ 3729, 3802).

71.      The parties to a HUD-approved short sale were also required to make certifications in other approval and closing documents. For instance, the seller and buyer executed a "HUD-1 Settlement Statement" at closing, which purported to disclose all payments, funds, costs, and commissions in the transaction.

72.      In many PFS, the seller, seller's agent, and mortgagee also executed a HUD Closing Worksheet. The HUD Closing Worksheet purported to disclose various information concerning the short sale, including the name of the purchaser, the type of financing, the sales commission, any consideration or incentive payments received by the seller, and the proceeds received by the mortgagee. The HUD Closing Worksheet was signed and certified by the seller and the seller's agent. The seller's agent further attested in that document that "there are no hidden terms or special understandings with the buyer, seller, appraiser, closing agent or mortgagee."

73.     Mortgagees relied on the parties' representations in these and other transaction documents to ensure that the short sale met the requirements of the PFS Program, including that the sales price was fair market value and the transaction was arm's length.  Without the parties' representations concerning compliance, the mortgagee could not approve the short sale and make an insurance claim to FHA.  Furthermore, if it was subsequently discovered that the mortgagee received payment of FHA insurance on a short sale that did not meet the PFS Program requirements, the mortgagee was liable for reimbursing HUD for the paid claim.

74.     HUD, in turn, relied on the parties' representations in the PFS Addendum and in other transactional documents to ensure that it paid claims for FHA insurance in accordance with applicable PFS Program requirements, and that it was not paying unwarranted or excessively high claims.

**C.     Defendants' Scheme to Defraud**

75.     From at least 2013 through 2016, the Individual Defendants, using the Corporate Defendants, engaged in numerous fraudulent short sales of residential properties, many of which involved FHA-insured mortgages.  Defendants fraudulently acquired many properties in the Eastern District of New York, free and clear of their FHA-insured mortgages, through these short sales.

76.     Aronov owned or controlled several of the Corporate Defendants, including the My Ideal Property Defendants.  The other Individual Defendants were business partners of Aronov or worked as agents or brokers for My Ideal Property or under the auspices of related companies.

77.     Using the My Ideal Property name and other corporate names, Defendants or their associates contacted property owners with defaulted mortgages to induce them to participate in short sales.  Defendants developed "lead lists" of prospective sellers, including by searching internet databases for financially distressed borrowers.  At times, Defendants also advertised to

prospective sellers in various ways, such as by posting flyers around neighborhoods with high rates of default, or through the internet.

78.     One of Defendants' internet advertisements stated: "Why are my Short Sales NOT Closing? We are the missing piece to Your Success! Ideal Property has been processing Short Sales and buying homes since 2008! With countless Short Sales and REO's [sic] already purchased, we will buy yours too!"   Another internet advertisement stated: "We have a no BS approach to potential properties where we can buy or do a short sale on. If you have a property for immediate purchase or a short sale that needs processing, call or email us the address and details. . . . Our funds are ready, and we are happy to pay your commission!"  Both of these advertisements directed property owners to the following internet address: www.MyIdealProp.com.

79.     On many occasions, Defendants or their associates cold called or knocked on the doors of property owners, inviting such individuals into one of the My Ideal Property offices (such as an office located at 116-55 Queens Blvd, Ste 206, Forest Hills, NY 11375).  In their offices, Defendants or their associates often offered property owners undisclosed payments of thousands of dollars to sell them their properties through short sales.

80.     Many of the properties targeted by Defendants had FHA-insured mortgages. Generally speaking, to qualify for an FHA-insured mortgage, the borrower was required to occupy the property as a primary residence for at least one year from inception of the mortgage.  Some of the property sellers involved in Defendants' fraudulent scheme were bona fide owner-occupants in financial distress.  But other property sellers never intended to occupy the properties as a primary residence, instead operating the properties as rentals from the time they obtained the FHA-insured mortgages.  Others were "straw" owners who had obtained FHA-insured mortgages at someone else's direction, often in exchange for a secretive payment, and who did not intend to live in the

property or make payments on the mortgage.  Then, after defaulting on the mortgage, the complicit straw owners were directed to sell the properties in a short sale coordinated by Defendants.

81.     Defendants or their associates often made payments to property owners months or years before the short sales closed, and promised the owners additional payments at the closings of the short sales.  In exchange for the initial payments, Defendants required the property owners to sign contracts of sale with corporate entities owned by one or more of the Individual Defendants.

82.     In many cases, in exchange for payment, Defendants required the owners to execute deeds transferring all of their rights, title, and interest in the properties to a corporate entity owned by one or more of the Individual Defendants prior to the short sales.  In these situations, when subsequently seeking approval for the short sale, Defendants concealed from the mortgagee, servicer, and HUD that the purported seller in the short sale did not have title to the property and had in fact already sold the property to the purported buyer in the short sale before the short sale was approved by the servicer.

83.     After enlisting a property owner in the scheme, Defendants assigned listing agents, brokers, and attorneys to the property owners, purportedly to represent them in the short sales. In reality, these agents, brokers, and attorneys conspired to sell the properties to the Individual Defendants for as low a price as possible.  Defendants or their associates then communicated with the servicer, purportedly on behalf of the property owner, to "process," or seek approval for, the short sale.

84.     In many of these fraudulent short sales, Konstantinovskiy nominally acted as listing agent and seller's broker, through his companies National Homeowner's Assistance and Settle NY Corp.  But Konstantinovskiy did not have an arm's length relationship with the other Individual Defendants, who often owned or controlled the shell company purchasers.   In reality,

Konstantinovskiy worked closely with Aronov out of offices that they jointly owned, leased, or shared, and from where they conspired with each other and others to fraudulently obtain properties through sham short sales.  Konstantinovskiy shared numerous financial and business ties with the other Individual Defendants, including owning the website of Aronov's company, My Ideal Property, "myidealprop.com."

85.     Despite being the purported listing agent and seller's broker, Konstantinovskiy did not seek to obtain fair market value for the property or to otherwise ensure that the transaction met the requirements of the PFS Program.  Instead, he coordinated with the other Individual Defendants to ensure that the property would be sold to Defendants for as low a price as possible.

86.     To that end, Konstantinovskiy generally did not show the properties to prospective purchasers who were not affiliated with Defendants.  Prospective purchasers who inquired about a property were often told it was "under contract" and unavailable.

87.     At times, Defendants secretively marketed the properties to a select group of prospective buyers for higher prices than the short sale prices, in order to "flip" the properties for a profit after the short sale closed.  Defendants did not disclose all offers they obtained for the properties, including offers obtained through such secretive marketing, to the servicer or mortgagee, as required by the PFS Program.

88.     On occasion, Defendants "flipped," or sold the properties obtained in the short sales for significantly higher prices to subsequent purchasers on or about the same day that the short sale closed.  In such situations, Defendants did not record the "flip" sale in public property records, or otherwise disclose the transaction to the servicer or mortgagee.  Instead, Defendants concealed the transaction by secretively transferring ownership interests in the corporate entity that had previously acquired the property in the short sale to the subsequent purchaser.

89.     In seeking approval for and closing short sales, Defendants and their associates made a host of materially false or misleading statements in such documents as the PFS Addendum, the HUD-1 Settlement Statement, and the HUD Closing Worksheet, including statements of the type described in Section B, above, concerning compliance with arm's length and other requirements of the PFS Program.

90.     As a result of their fraudulent scheme, Defendants fraudulently acquired numerous residential properties for substantially below-market prices, the lenders released the associated mortgages, and HUD paid millions of dollars of unwarranted claims for insurance from federal funds.

## EXEMPLAR FRAUDULENT SHORT SALES BY DEFENDANTS

91.     The following short sales exemplify Defendants' fraudulent scheme.

**I.      123 Halsey Street, Brooklyn, New York 11216**

92.     Defendants Aronov, Borovinskiy,  Konstantinovskiy, 308 Linden St LLC, Arbie Management, IA Investors LLC, National Homeowners Assistance, and PIM Equities Inc. (together, the "123 Halsey Defendants"), and other co-conspirators engaged in a fraudulent short sale of 123 Halsey Street, Brooklyn, New York 11216.  The short sale closed on or about July 12, 2013 for the sales price of $388,000.  As a result of the fraudulent short sale, Aronov, through his company 308 Linden St LLC, acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

93.     On June 29, 2009, individuals referred to herein as "Seller 1" and "Seller 2" took out an FHA-insured mortgage on 123 Halsey Street with a principal balance of $597,835.

94.     In or about 2012, the 123 Halsey Defendants contacted Seller 1 and offered him money to sell them 123 Halsey Street in a short sale to be coordinated by them.

95.     On or about December 12, 2012, Seller 1 and Seller 2 signed a "Third Party Authorization and Release Form" authorizing Konstantinovskiy and others of National Homeowners Assistance to act as their representatives in negotiating a short sale of 123 Halsey Street with the servicer of their mortgage.

96.     On or about February 18, 2013, LL Fund Inc., a company controlled by Aronov, paid Seller 1 $5,000, by check, to acquire his deed to the property.  The check included the memo line: "For 123 Halsey St. Deed Purchase."  The 123 Halsey Defendants paid Seller 1 another $20,000 in cash at closing of the short sale in July 2013.

97.     On or about February 18, 2013, Seller 1 and Seller 2 signed a quitclaim deed transferring all of their rights, title, and interest in the property to PIM Equities Inc., a company owned by Aronov.

98.     Between approximately February 2013 and June 2013, Konstantinovskiy and National Homeowners Assistance, as Seller 1 and Seller 2's purported agent, sent several offers to the servicer for 123 Halsey Street from corporate entities that were owned or controlled by Aronov, including IA Investors LLC and 308 Linden St LLC, to purchase 123 Halsey Street in a short sale.

99.     On or about July 10, 2013, the servicer approved a short sale to 308 Linden St LLC, an entity controlled by Aronov, for the sales price of $388,000.  The approval was contingent upon several conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the receipt of an Arm's Length Affidavit.

100.    On or about July 12, 2013, the date of closing of the short sale, the parties to the transaction signed an "Affidavit of 'Arm's Length Transaction'," which was sent to the servicer of the mortgage.  The Affidavit was notarized and signed under penalty of perjury by the following individuals: Seller 1 and Seller 2, as purported sellers of the property in the short sale;

26

Konstantinovskiy of National Homeowners Assistance as seller's agent; Co-Conspirator 7, on behalf of the buyer in the short sale, 308 Linden St LLC, a company owned by Aronov; and Borovinsky of Arbie Management as buyer's agent.

101.    The signatories acknowledged the materiality of the statements in the Affidavit, representing, among other things, that "[e]ach signatory to this Affidavit expressly acknowledges that the Lender is relying upon the representations made herein as consideration for discounting the payoff on the Loan(s) which is secured by a deed of trust or mortgage encumbering the Property"; and "[e]ach signatory to this Affidavit expressly acknowledges that any misrepresentation made by him or her may subject him or her to civil liability."

102.    Nevertheless, the signatories made several materially false or misleading representations in the Affidavit, including that: (i) "[t]he purchase and sale transaction reflected in the Agreement is an 'Arm's Length Transaction,' meaning that the transaction has been negotiated by unrelated parties, each of whom is acting in his or her own self-interest"; (ii) "the sale price is based on fair market value of the Property"; (iii) "[w]ith respect to those persons signing this Affidavit as an agent for either the Seller(s), the Buyer(s), or both, those agents are acting in the best interests of their respective principal(s)"; (iv) "[t]here are no hidden terms or hidden agreements or special understandings between the Seller(s) and the Buyer(s) or among their respective agents which are not reflected in the Agreement"; and (v) "[t]he Seller(s) shall not receive any proceeds from the sale of the Property reflected in the Agreement."

103.    These representations were false, including because (1) the 123 Halsey Defendants made undisclosed payments to Seller 1; (2) Seller 1 and Seller 2 had already transferred title to the property to another company owned by Aronov several months before the short sale closed; and (3) the purported agent for Seller 1 and Seller 2 (Konstantinovskiy) was in a common commercial

enterprise with the owner of the shell company buyer (Aronov) and the buyer's agent (Borovinsky), in which he had conspired to sell the property to Aronov's shell company in the short sale for as low a price as possible. These facts were concealed from the servicer, mortgagee, and HUD.

104.     On or about July 12, 2013, the date of closing, Co-Conspirator 7 signed, for the purchaser 308 Linden St LLC, a HUD-1 Settlement Statement, which was sent to the mortgagee. Co-Conspirator 7 and 308 Linden St LLC also falsely represented that the sellers received no other payments in the sale other than a permitted $750 incentive payment.

105.     Also on or about July 12, 2013, the date of closing, Konstantinovskiy signed a HUD Closing Worksheet, as seller's agent, which was sent to the mortgagee. On the HUD Closing Worksheet, Konstantinovskiy falsely certified that the sellers received no payments in the sale other than a permitted $750 incentive payment, and that "there are no hidden terms or special understandings with the buyer, seller, appraiser, closing agent or mortgagee."

106.     In reality, as described above, Seller 1 received payments that were not disclosed to the servicer, mortgagee, or HUD.

107.     As a result of the short sale, 308 Linden St LLC, a company owned by Aronov, acquired the property for $388,000, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage. Arbie Management and National Homeowners Assistance also received $23,280 in broker commissions from the sales price.

108.     On or about August 20, 2013, the servicer submitted a claim to HUD for insurance payment on behalf of the mortgagee. On or about August 30, 2013, HUD paid $283,842.32 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

## II.     1178 Gates Avenue, Brooklyn, New York 11216

109.    Defendants Aronov, Borovinsky, Konstantinovskiy, 1178 Gates Ave Inc, Arbie Management, Bedstuy Group, LLC, and National Homeowners Assistance (together, the "1178 Gates Defendants"), and other co-conspirators engaged in a fraudulent short sale of 1178 Gates Avenue, Brooklyn, New York 11216.  The short sale closed on or about November 12, 2013 for the sales price of $203,000.  As a result of the short sale, Aronov, through his corporation 1178 Gates Ave Inc., acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

110.    On April 30, 2009, an individual referred to herein as "Seller 3" took out an FHA-insured mortgage on 1178 Gates Avenue with a principal balance of $569,494.

111.    In or about 2013, the 1178 Gates Defendants contacted Seller 3 and offered him money to sell them 1178 Gates Avenue in a short sale to be coordinated by them.  The 1178 Gates Defendants paid Seller 3 approximately $5,000 at the closing of the short sale.

112.    On or about June 24, 2013, Seller 3 signed a "Third Party Authorization and Release Form" authorizing the servicer and mortgagee to speak with and disclose financial records pertaining to his mortgage to Konstantinovskiy and others of National Homeowners Assistance.

113.    On or about June 24, 2013, Co-Conspirator 2 signed, on behalf of the purchaser Bedstuy Group LLC, a company owned or controlled by Aronov, a memorandum of contract of sale of the property by Seller 3 to Bedstuy Group LLC.

114.    In or about October 2013, Konstantinovskiy and National Homeowners Assistance, as Seller 3's purported agent, sent several offers to the servicer for 1178 Gates Avenue from corporate entities that were owned or controlled by Aronov to purchase 1178 Gates Avenue in a short sale.

115.    On or about October 9, 2013, the servicer approved a short sale to 1178 Gates Ave Inc, an entity controlled by Aronov, for the purchase price of $203,000.  The approval was contingent upon several conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the receipt of an Arm's Length Affidavit.

116.    On or about November 12, 2013, the date of closing of the short sale, the parties to the transaction signed an "Affidavit of 'Arm's Length Transaction'," which was sent to the servicer.  The Affidavit was signed under penalty of perjury by the following individuals: Seller 3, as purported seller of the property in the short sale; Konstantinovskiy of National Homeowners Assistance as seller's agent; Aronov, on behalf of the buyer in the short sale, 1178 Gates Ave Inc; and Borovinsky of Arbie Management as buyer's agent.

117.    The signatories acknowledged the materiality of the statements in the Affidavit, representing, among other things, that "[e]ach signatory to this Affidavit expressly acknowledges that the Lender is relying upon the representations made herein as consideration for discounting the payoff on the Loan(s) which is secured by a deed of trust or mortgage encumbering the Property"; and "each signatory to this Affidavit expressly acknowledges that any misrepresentation made by him or her may subject him or her to civil liability."

118.    Nevertheless, the signatories made several materially false or misleading representations in the Affidavit, including that: (i) "[t]he purchase and sale transaction reflected in the Agreement is an 'Arm's Length Transaction,' meaning that the transaction has been negotiated by unrelated parties, each of whom is acting in his or her own self-interest"; (ii) "the sale price is based on fair market value of the Property"; (iii) "[w]ith respect to those persons signing this Affidavit as an agent for either the Seller(s), the Buyer(s), or both, those agents are acting in the best interests of their respective principal(s)"; (iv) "[t]here are no hidden terms or hidden

agreements or special understandings between the Seller(s) and the Buyer(s) or among their respective agents which are not reflected in the Agreement"; and (v) "[t]he Seller(s) shall not receive any proceeds from the sale of the Property reflected in the Agreement."

119.    These representations were false, including because (1) the 1178 Gates Defendants had offered Seller 3 undisclosed payments to participate in the short sale; (2) the purported agent for Seller 3 (Konstantinovskiy) was in a common commercial enterprise with the owner of the shell company buyer (Aronov) and the buyer's agent (Borovinsky), in which he conspired to sell the property to Aronov's shell company in the short sale for as low a price as possible; and (3) as discussed below, the 1178 Gates Defendants had an undisclosed agreement to "flip" the property at or around the closing date of the short sale to a subsequent purchaser for a higher price.  These facts were concealed from the servicer, mortgagee, and HUD.

120.    On or about November 12, 2013, the date of closing, Aronov signed, for the purchaser 1178 Gates Ave Inc, a HUD-1 Settlement Statement, which was sent to the mortgagee. On the HUD-1, Aronov and 1178 Gates Ave Inc falsely represented that Seller 3 received no payment in the sale other than a permitted $750 incentive payment.

121.    Also on or about November 12, 2013, the date of closing, Konstantinovskiy signed a HUD Closing Worksheet, as seller's agent, which was sent to the mortgagee.  On the HUD Closing Worksheet, Konstantinovskiy falsely certified that Seller 3 received no payments in the sale other than a permitted $750 incentive, and that "there are no hidden terms or special understandings with the buyer, seller, appraiser, closing agent or mortgagee."

122.    In reality, as described above, Seller 3 received payment that was not disclosed to the servicer, mortgagee, or HUD.

31

123.    As a result of the short sale, 1178 Gates Ave Inc, a company owned by Aronov, acquired the property in the short sale for $203,000, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage.   Arbie Management and National Homeowners Assistance also received $12,180 in broker commissions from the sales price.

124.    In addition, on or about the date of closing of the short sale (November 12, 2013), Aronov "flipped" the property to a subsequent purchaser, an individual referred to herein as "Subsequent Purchaser 1," without recording the transaction in real property records, by transferring shares of 1178 Gates Ave. Inc., the corporation that acquired the property in the short sale, to Subsequent Purchaser 1.  On or about November 12, 2013, Subsequent Purchaser 1 signed a mortgage on the property as the purported "president" of 1178 Gates Ave Inc.  The 1178 Gates Defendants concealed this same-day flip from the servicer, mortgagee, and HUD.

125.    On or about January 3, 2014, the servicer submitted a claim to HUD for insurance payment on behalf of the mortgagee.  On or about January 31, 2014, HUD paid $522,244 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

### III.    175 Vernon Avenue, Brooklyn, New York 11206

126.    Defendants Aronov, Borovinsky, Konstantinovskiy, 175 Vernon Ave Inc, Arbie Management, LL Fund Inc., and National Homeowners Assistance (together, the "175 Vernon Defendants"), and other co-conspirators engaged in a fraudulent short sale of 175 Vernon Avenue, Brooklyn, New York 11206.  The short sale closed on or about December 26, 2013 for the sales price of $222,200.  As a result of the short sale, Aronov, through his corporation 175 Vernon Avenue Inc, acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

127.     On September 30, 2008, an individual referred to herein as "Seller 4" took out an FHA-insured mortgage on 175 Vernon Avenue with the principal balance of $763,633.

128.     In or about early 2013, the 175 Vernon Defendants contacted Seller 4 and offered him money to sell them 175 Vernon Avenue in a short sale to be coordinated by them.  The 175 Vernon Defendants made approximately $50,000 in undisclosed payments to Seller 4, in cash and by check.

129.     On or about February 20, 2013, Seller 4 signed a "Third Party Authorization and Release Form" authorizing Konstantinovskiy and others of National Homeowners Assistance to act as his representative in negotiating a short sale with the servicer of his mortgage.

130.     On or about the same date, February 20, 2013, Seller 4 signed a contract to sell the property to IA Investors, LLC, a company owned by Aronov, for the sales price of $150,000. Aronov signed the contract on behalf of IA Investors, LLC.

131.     On or about March 21, 2013, LL Fund Inc., a company controlled by Aronov, paid Seller 4 $10,000, by check, to acquire his deed to the property.  Co-Conspirator 2 signed the check on behalf of LL Fund Inc.  The check included the memo line: "For 175 Vernon Deed Purchase."

132.     On or about June 20, 2013, White Collar Construction Co., a company owned by Co-Conspirator 5, filed a UCC-1 financing statement on the property in New York City property records, purporting to be the holder of a fixture lien on the property.

133.     On or about November 29, 2013, the servicer approved a short sale to 175 Vernon Avenue Inc., an entity controlled by Aronov, for the sales price of $222,200.  The approval was contingent upon several conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the receipt of an Arm's Length Affidavit.

134.     On or about December 26, 2013, the date of the closing of the short sale, the parties to the transaction signed an "Arms-Length Transaction Affidavit," which was provided to the servicer. The notarized affidavit was signed under penalty of perjury by the following individuals: Seller 4, as purported seller of the property in the short sale; Konstantinovskiy of National Homeowners Assistance as seller's broker; Aronov as "member" of the buyer, 175 Vernon Ave Inc; and Borovinsky of Arbie Management as buyer's broker.

135.     The signatories acknowledged the materiality of the statements in the Affidavit, representing that "[e]ach signatory understands, agrees and intends that [*inter alia*, the servicer] are relying upon the statements made in the affidavit as consideration for the reduction of the payoff amount of the Mortgage and agreement to the sale of the Mortgaged Premises"; and "[e]ach signatory understands that a misrepresentation may subject the responsible party to civil and/or criminal liability."

136.     Nevertheless, the signatories made several materially false or misleading representations in the Affidavit, including that: (i) "[a]ll parties to the transaction attest that the sale constitutes an 'arm's length' transaction. An 'arm's length transaction' is a transaction between parties who are independent of one another, and unrelated and unaffiliated by family, marriage or commercial enterprise, other than the purchase and sale of the Mortgaged Premises between the Seller(s) and the purchaser(s) that is the specific subject of the proposed short sale as disclosed to [the servicer]"; (ii) "[n]either the Seller(s) nor the purchaser(s) will receive any funds or commissions from the sale of the Mortgaged Premises"; and (iii) "[t]here are no agreements, understandings or contracts relating to the current sale or subsequent sale of the Mortgaged Premises that have not been disclosed to you."

137.    These representations were false, including because (1) the 175 Vernon Defendants made undisclosed payments to Seller 4 to participate in the short sale; (2) Seller 4 had already transferred his title to the property to another company owned by Aronov several months before the short sale closed; and (3) the purported agent for Seller 4 (Konstantinovskiy) was in a common commercial enterprise with the owner of the shell company buyer (Aronov) and the buyer's agent (Borovinsky), in which he conspired to sell the property to Aronov's shell company in the short sale for as low a price as possible.  These facts were concealed from the servicer, mortgagee, and HUD.

138.    On or about December 26, 2013, the date of closing, Aronov signed, for the purchaser 175 Vernon Avenue Inc., a HUD-1 Settlement Statement, which was sent to the mortgagee, Fannie Mae.  On the HUD-1, Aronov and 175 Vernon Avenue Inc. falsely represented that Seller 4 received no payments in the sale but a permitted $1,000 incentive payment.

139.    Also on or about December 26, 2013, the date of the closing, Konstantinovskiy signed a HUD Closing Worksheet, as broker for the seller, which was also sent to the mortgagee. On the HUD Closing Worksheet, Konstantinovskiy falsely certified that Seller 4 received no payments in the sale but for a permitted $1,000 incentive payment, and that "there are no hidden terms or special understandings with the buyer, seller, appraiser, closing agent or mortgagee."

140.    In reality, as described above, Seller 4 received payments that were not disclosed to the servicer, mortgagee, or HUD.

141.    As a result of the short sale, 175 Vernon Ave Inc, a corporation owned by Aronov, acquired the property in the short sale for $222,200, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage.  Arbie Management and National Homeowners Assistance also received $13,332 in broker commissions from the sale proceeds.

142.     On or about January 24, 2014 and August 5, 2014, the servicer submitted claims to HUD for insurance payment on behalf of the mortgagee.  On or about February 9 and August 15, 2014, HUD paid $698,457.29 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

**IV.     1083 Lafayette Avenue, Brooklyn, New York, 11221**

143.     Defendants Aronov, Borovinsky, Konstantinovskiy, 1083 Lafayette Avenue, LLC, Arbie Management, AG2 Equities, Inc., LL Fund Inc., National Homeowners Assistance, and Phase 2 Development, LLC (the "1083 Lafayette Defendants"), and other co-conspirators engaged in a fraudulent short sale of 1083 Lafayette Avenue, Brooklyn, New York 11221.  The short sale closed on or about September 17, 2014 for the sales price of $278,000.  As a result of the short sale, Aronov, through his company 1083 Lafayette Avenue, LLC, acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

144.     On or about March 11, 2011, an individual referred to herein as "Seller 5" took out an FHA-insured mortgage on 1083 Lafayette Avenue with a principal balance of $389,860.

145.     When he purchased 1083 Lafayette Avenue, Seller 5 was a "straw" buyer acting at the direction of the property's previous owner, Icon Property Management, Inc. ("Icon").  On or about March 11, 2011, one or more representatives of Icon gave Seller 5 undisclosed cash payments of approximately $15,000 to take out an FHA-insured mortgage and buy the property from Icon for $400,000.  Despite taking out the FHA-insured mortgage for the purported purpose of acquiring the property as a home residence, Seller 5 never lived in, or planned on living in the property; never visited the property; and personally made no payments on the mortgage.

146.     After the mortgage went into default, one or more representatives of Icon directed Seller 5 to work with the 1083 Lafayette Defendants to sell the property through a short sale.   On

or about April 5, 2013, LL Fund Inc., a company controlled by Aronov, paid a representative of Icon $15,000, by check, for directing Seller 5 to work with the 1083 Lafayette Defendants to sell the property in a short sale.  The memo line of the check stated: "For 1083 Lafayette Ave/ Finders Fee."

147.    With the complicit straw owner (*i.e.*, Seller 5), the 1083 Lafayette Defendants pre-arranged a sale to themselves more than a year before the short sale closed.  Between approximately April 2013 and September 2014, Seller 5 signed several contracts of sale with companies owned or controlled by Aronov, including Phase 2 Development LLC and 1083 Lafayette Avenue LLC.  Co-Conspirator 5 signed a memorandum of one such contract of sale, dated April 5, 2013, on behalf of the purchaser, Phase 2 Development LLC.

148.    On or about November 5, 2013, Seller 5 signed a "Third Party Authorization and Release Form" authorizing Konstantinovskiy and National Homeowners Assistance to communicate with the mortgagee concerning a short sale.

149.    On or about June 6, 2014, the parties to the short sale signed an "FHA Pre-Foreclosure Sale Addendum," which was sent to the servicer and mortgagee, a federally insured financial institution.  The PFS Addendum was signed under penalty of perjury by the following individuals: Seller 5, as purported seller of the property in the short sale; Konstantinovskiy of National Homeowners Assistance, as seller's agent and listing agent; Borovinsky of Arbie Management, as buyer's agent; and Co-Conspirator 5, on behalf of the buyer, 1083 Lafayette Avenue, LLC, a company controlled by Aronov.

150.    The signatories acknowledged the materiality of the statements in the Addendum, representing that "[e]ach signatory understands, agrees and intends that the Mortgagee is relying upon the statements made in this Addendum as consideration for the reduction of the payoff

amount of the Mortgage and agreement to the sale of the Property"; and "[e]ach signatory certifies that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.  HUD will prosecute false claims and statements.  Conviction may result in criminal and/or civil penalties.  (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)."

151.    Nevertheless, the signatories made several materially false or misleading representations in the Addendum, including that: (i) "[t]he sale of the Property is an 'arm's length' transaction, between Seller(s) and Buyer(s) who are unrelated and unaffiliated by family, marriage, or commercial enterprise"; (ii) "[a]dditionally, the transaction is characterized by a selling price and other conditions that would prevail in an open market environment"; (iii) "there are no hidden terms or special understandings that exist between any of the parties involved in the transaction including, but not limited to the buyer, seller, appraiser, broker, sales agent (including, but not limited to the listing agent and seller's agent), closing agent and mortgagee"; and (iv) "[a]ny relationship or affiliation by family, marriage, or commercial enterprise to the Seller(s) or Buyer(s) by other parties involved in the sale of the Property has been disclosed to the Mortgagee."

152.    These representations were false, including because Seller 5 was a straw owner taking direction from undisclosed principals, and the purported agent for Seller 5 (Konstantinovskiy) was in a common commercial enterprise with the owner of the shell company buyer (Aronov) and the buyer's agent (Borovinsky), in which he conspired to sell the property to Aronov's shell company in the short sale for as low a price as possible.  These facts were concealed from the servicer, mortgagee, and HUD.

153.    On or about September 29, 2014, AG2 Equities, Inc., a company controlled by Aronov, paid Icon $5,000, by check, for directing Seller 5 to work with the 1083 Lafayette

Defendants to sell the property through a short sale. The check was signed by Co-Conspirator 2. The memo line stated: "For 1083 Lafayette."

154.    As a result of the short sale, 1083 Lafayette Avenue, LLC, a company owned by Aronov, acquired the property in the short sale for $278,000, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage. Arbie Management and National Homeowners Assistance also received $16,680 in broker commissions from the sale proceeds.

155.    On or about September 18, 2015, the mortgagee submitted a claim to HUD for insurance payment. On or about November 26, 2015, HUD paid $156,581.90 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

**V.      216-35 111th Avenue, Queens Village, New York 11429**

156.    Defendants Aronov, Borovinsky, Konstantinovskiy, Arbie Management, IA Investors LLC, National Homeowners Assistance, and ZT Equities LLC (the "216-35 111th Defendants"), and other co-conspirators engaged in a fraudulent short sale of 216-35 111th Avenue, Queens Village, New York, 11429. The short sale closed on or about October 23, 2014 for the sales price of $220,250. As a result of the short sale, Aronov, through his company ZT Equities LLC, acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

157.    On April 30, 2008, an individual referred to herein as "Seller 6" took out an FHA-insured mortgage on 216-35 111th Avenue with the principal balance of $432,390.

158.    In or about early 2013, the 216-35 111th Defendants contacted Seller 6 and offered her money to sell them 216-35 111th Avenue in a short sale to be coordinated by them.

159.    On or about January 17, 2013, Seller 6 signed a "Third Party Authorization and Release Form" authorizing Konstantinovskiy and others of National Homeowners Assistance to act as her representative in negotiating with the servicer of her mortgage concerning a short sale

160.    On or about January 22, 2013, LL Fund Inc., a company owned by Aronov, paid Seller 6 $5,000, by check, to acquire Seller 6's deed to the property.  Aronov signed the check on behalf of LL Fund Inc.  The memo line of the check stated: "For 216-35 111th Ave. Deed Purchase."

161.    Between approximately January 2013 and October 2014, Seller 6 signed multiple contracts for sale of the property to corporate entities that were owned or controlled by Aronov, including IA Investors LLC and ZT Equities LLC.

162.    On or about March 7, 2014, R&J Org. Inc., a corporation owned or controlled by Aronov, filed a UCC-1 financing statement on the property, purporting to be the holder of a fixture lien on the property.

163.    On or about October 23, 2014, the date of the closing of the short sale, the parties to the transaction signed a "Short Sale Addendum," which was provided to the servicer and mortgagee.  The Addendum was signed under penalty of perjury by the following individuals: Seller 6, as purported seller of the property in the short sale; Konstantinovskiy of National Homeowners Assistance, as seller's agent and listing agent; Co-Conspirator 10, a My Ideal Property agent, on behalf of the buyer, ZT Equities LLC, a company owned by Aronov; and Borovinsky of Arbie Management, as buyer's agent.

164.    The signatories acknowledged the materiality of the statements in the Addendum, representing that: "[e]ach signatory understands, agrees and intends that the Mortgagee is relying upon the statements made in this Addendum as consideration for the reduction of the payoff

amount of the Mortgage and agreement to the sale of the Property"; and "[e]ach signatory also certifies that the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.  HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties.  (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802.)."

165.   Nevertheless, the signatories made several materially false or misleading representations in the Addendum, including that: (i) "[t]he sale of the Property is an "arm's length" transaction, between Seller(s) and Buyer(s) who are unrelated and unaffiliated by family, marriage, or commercial enterprise"; "[a]dditionally, the transaction is characterized by a selling price and other conditions that would prevail in an open market environment"; (ii) "[t]here are no hidden terms or special understandings that exist between any of the parties involved in the transaction including, but not limited to the buyer, seller, appraiser, broker, sales agent (including, but not limited to the listing agent and seller's agent), closing agent and mortgagee"; (iii) "[a]ny relationship or affiliation by . . . commercial enterprise to the Seller(s) or Buyer(s) by other parties involved in the sale of the property has been disclosed to the Mortgagee" and (iv) "[t]here are no agreements, understandings, current or pending higher offers, or contracts relating to the current sale or subsequent sale of the Property that have not been disclosed to the Mortgagee."

166.   These representations were false, including because (1) the 216-35 111th Defendants made undisclosed payments to Seller 6 to participate in the short sale; (2) Seller 6 had already transferred her title in the property to the 216-35 111th Defendants more than a year before the short sale closed; and (3) the purported agent for Seller 6 (Konstantinovskiy) was in a common commercial enterprise with the owner of the shell company buyer (Aronov) and the buyer's agent (Borovinsky), in which he conspired to sell the property to Aronov's shell company in the short

sale for as low a price as possible.  These facts were concealed from the servicer, mortgagee, and HUD.

167.    As a result of the short sale, ZT Equities LLC, a company owned by Aronov, acquired the property for $220,250, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage.  Arbie Management and National Homeowners Assistance also received $13,215 in broker commissions from the sale proceeds.

168.    On or about November 10, 2014 and June 4, 2015, the mortgagee submitted claims to HUD for insurance payment.  On or about February 2, 2015 and November 28, 2015, HUD paid $345,567.83 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

### VI.    181 Schaefer Street, Brooklyn, New York 11207

169.    Defendants Aronov, Borovinsky, Konstantinovskiy, and 1S8C Holdings LLC, 2320 Baeumont Ave Unit 3D LLC, and IJ Development LLC (the "181 Schaefer Street Defendants"), and other co-conspirators engaged in a fraudulent short sale of 181 Schaefer Street, Brooklyn, New York 11207.  The short sale closed on or about June 2, 2015 for the sales price of $231,000.  As a result of the short sale, Aronov, through his company 2320 Baeumont Ave Unit 3D LLC, acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

170.    On or about May 19, 2006, Ora Management, Inc. ("Ora"), a corporation owned or controlled by an individual referred to herein as "Co-Conspirator 11," who later became a business partner of Aronov, acquired 181 Schaefer Street.

171.    On or about May 19, 2006, Ora took out a first mortgage on the property with a principal balance of $255,000, and a second mortgage with a principal balance of $240,000.

172.     On or about July 9, 2007, Ora executed a quitclaim deed conveying 181 Schaefer Street to a "straw" buyer, an individual referred to herein as Seller 7.

173.     On or about January 29, 2008, Seller 7 executed a "Consolidation, Extension, and Modification Agreement" with the mortgagee of the property in which Seller 7 agreed to assume the obligations under three mortgages on the property with a total unpaid principal balance of $569,800: specifically, the two mortgages taken out by Ora Management, Inc. on or about May 19, 2006 and a third mortgage taken out by Seller 7 on or about January 29, 2008, with a principal balance of $74,800.  Seller 7's consolidated mortgage with a principal balance of $569,800 was FHA-insured.

174.     Seller 7's first payment was due on her FHA-insured mortgage on or about April 1, 2008; the debt was reported as delinquent as of December 1, 2008.

175.     On or about May 18, 2011, Seller 7 entered into a Consent Order with the Comptroller of the Currency of the United States Department of the Treasury.  In the Consent Order, the Comptroller found, among other things, that from at least November 2006 through March 2007, while working as an assistant branch manager of a bank, Seller 7 engaged in a "check-kiting-like scheme on behalf of a close personal friend who held at least five personal and business accounts" at the bank.  The Comptroller also found that Seller 7 received cash payments from her friend for her participation in the scheme.

176.     Co-Conspirator 11 was Seller 7's "close personal friend" referenced in the Consent Order.  Seller 7 later worked with Co-Conspirator 11 on fraudulent short sales as an employee of a company owned or controlled by Co-Conspirator 11.

177.     On or about June 24, 2013, Seller 7 signed a contract for the sale of 181 Schaefer Street to IJ Development LLC, a company owned by Aronov.  Aronov signed the contract on

behalf of the purchaser.  At or around the time the contract was entered into, Co-Conspirator 11 was a business partner of Aronov and the two conspired to fraudulently acquire residential properties through short sales.

178.    On or about April 24, 2015, the parties to the short sale signed an "Affidavit of 'Arm's Length Transaction'," provided to the servicer and mortgagee, a federally insured financial institution. The Affidavit was signed under penalty of perjury by the following individuals: Seller 7, as purported seller of the property; Konstantinovskiy of "Voro LLC" as seller's agent;  Co-Conspirator 4, a My Ideal Property employee, on behalf of the buyer, 2320 Baeumont Ave Unit 3D LLC, a company owned by Aronov; and Borovinsky of "Voro LLC" as buyer's agent.

179.    The signatories acknowledged the materiality of the statements in the Affidavit, representing that "[e]ach signatory to this Affidavit expressly acknowledges that the Lender is relying upon the representations made herein as consideration for discounting the payoff on the loan(s) which is/are secured by a deed of trust or mortgage encumbering the Property"; and "[e]ach signatory to this Affidavit expressly acknowledges that any misrepresentation made by him or her may subject him or her to civil liability."

180.    Nevertheless, the signatories made several materially false or misleading representations in the Affidavit, including that: (i) "[t]he purchase and sale transaction reflected in the Agreement is an "Arm's Length Transaction," meaning that the transaction has been negotiated by unrelated parties, each of whom is acting in his or her own self-interest"; (ii) "the sale price is based on fair market value of the Property"; and (iii) "[t]here are no hidden terms or hidden agreements or special understandings between the Seller(s) and the Buyer(s) or among their respective agents which are not reflected in the Agreement or the escrow instructions associated with this transaction."

181.    These representations were false, including because Seller 7 was a straw owner taking direction from undisclosed principals, including Aronov and Co-Conspirator 11; and the purported agent for Seller 7 (Konstantinovskiy) was in a common commercial enterprise with the owner of the shell company buyer (Aronov) and the buyer's agent (Borovinsky), in which he conspired to sell the property to Aronov's shell company in the short sale for as low a price as possible.  These facts were concealed from the servicer, mortgagee, and HUD

182.    As a result of the short sale, 2320 Baeumont Ave Unit 3D LLC, a company owned by Aronov, acquired the property in the short sale for $231,000, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage.  Konstantinovskiy and Borovinsky also received $13,860 in broker commissions from the sale proceeds.

183.    On or about June 3, 2015, the day after closing of the short sale, Aronov signed a bargain and sale deed – on behalf of both the buyer and as "single member" of the seller, 2320 Baeumont Ave. Unit 3D LLC – conveying the property to himself.

184.    On or about July 19, 2016, Aronov signed a bargain and sale deed conveying the property from himself to 1S8C Holdings LLC, another company he owned or controlled.  1S8C Holdings LLC has owned the property through the present date.

185.    On or about August 29, 2016, the mortgagee submitted a claim to HUD for insurance payment.  On or about October 10, 2016, HUD paid $615,279.12 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

**VII.    629A Madison Street, Brooklyn, New York 11221**

186.    Defendants Aronov,  1021 B Holdings LLC, AG2 Equities, Inc., My Ideal Property Rockaway LLC, and Zor Equities LLC (the "629A Madison Defendants"), and other co-conspirators engaged in a fraudulent short sale of 629A Madison St. Brooklyn, New York 11221.

45

The short sale closed on or about June 11, 2015 for the sales price of $528,000.   As a result of the short sale, Aronov, through his company Zor Equities LLC, acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

187.    On or about April 28, 2006, an individual referred to herein as "Seller 8" took out an FHA-insured mortgage on 629A Madison Street with a principal balance of $708,150.

188.    In or about early 2014, the 629A Madison Defendants contacted Seller 8 and offered him money to sell them 629A Madison Street in a short sale to be coordinated by them. The 629A Madison Defendants made at least $42,000 in undisclosed payments to Seller 7, in cash and by check.

189.    On or about February 10, 2014, Seller 8 received $20,000 by check from AG2 Equities, Inc., a company owned or controlled by Aronov.  Co-Conspirator 2 signed the check on behalf of AG2 Equities, Inc. The memo line of the check stated: "For 629A Madison St. Deed Purchase."  In addition, on or about June 11, 2015 (the date of the closing of the short sale), Seller 8 received more than $22,000 in cash payments from the 629A Madison Street Defendants.

190.    Between approximately January 2014 and April 2015, Seller 8 signed multiple contracts for sale of the property to corporate entities that were owned or controlled by Aronov, including 629A Mad St Inc. and Zor Equities LLC.

191.    On or about February 5, 2015, Seller 8 signed a "Third Party Authorization and Release Form" authorizing the servicer and mortgagee to speak with and disclose financial records pertaining to Seller 8's mortgage to Co-Conspirator 8 and others of My Ideal Property Rockaway.

192.    On or about April 9, 2015, the parties to the short sale signed an "FHA Pre-Foreclosure Sale Addendum," which was provided to the servicer and mortgagee, a federally insured financial institution.  The PFS Addendum was signed under penalty of perjury by several

46

individuals, including Seller 8, as purported seller of the property in the short sale; Co-Conspirator 8 of My Ideal Property Rockaway LLC as listing agent, listing broker, buyer's agent, and buyer's broker; and Co-Conspirator 9, a My Ideal Property agent, as purported "sole member" of the purchaser, Zor Equities, LLC, a company controlled by Aronov.[2]

193.    The signatories acknowledged the materiality of the statements in the Addendum, representing that "[e]ach signatory understands, agrees and intends that the Mortgagee is relying upon the statements made in this Addendum as consideration for the reduction of the payoff amount of the Mortgage and agreement to the sale of the Property"; and "[e]ach signatory certifies that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.  HUD will prosecute false claims and statements.  Conviction may result in criminal and/or civil penalties.  (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)."

194.    Nevertheless, the signatories made several materially false or misleading representations in the Addendum, including that: (i) "[t]he sale of the Property is an arm's length transaction, between Seller(s) and Buyer(s) who are unrelated and unaffiliated by family, marriage, or commercial enterprise"; (ii) "[a]dditionally, the transaction is characterized by a selling price and other conditions that would prevail in an open market environment"; (iii) "[t]here are no hidden terms or special understandings that exist between any of the parties involved in the transaction including, but not limited to the buyer, seller, appraiser, broker, sales agent (including, but not limited to the listing agent and buyer's agent), closing agent and mortgagee"; (iv) "[a]ny relationship or affiliation by family, marriage, or commercial enterprise to the Seller(s) or Buyer(s) by other parties involved in the sale of the Property has been disclosed to the Mortgagee"; (v)

---

[2] Subsequently, on or about June 11, 2015 (the date of closing of the short sale), Aronov signed a mortgage as purported "member" of the mortgagor, Zor Equities LLC.

"[n]either the Seller(s) nor the Buyer(s) will receive any funds or commissions from the sale of the Property except that the Seller(s) may receive a payment if it is offered by the Mortgagee, and, if the payment is made at closing of the sale of the Property, reflected on the HUD-1 Settlement Statement"; (vi) "[a]ll amounts to be paid to any person or entity, including holders of other liens on the Property, in connection with the pre-foreclosure sale have been disclosed to and approved by the Mortgagee and will be reflected on the HUD-1 Settlement Statement"; and (vii) "[t]he Listing Agent and Listing Broker certify that the subject property was initially listed in the Multiple Listing Service (MLS) for a period of 15 calendar days before any offers were evaluated."

195.    These representations were false, including because (1) the 629A Madison Defendants made undisclosed payments to Seller 8 to participate in the short sale; (2) Seller 8 had already transferred title to the 629A Madison Defendants more than a year before the short sale closed; and (3) the purported agent for Seller 8 (Co-Conspirator 8) was in a common commercial enterprise with the owner of the shell company buyer (Aronov), in which he conspired to sell the property to Aronov's shell company in the short sale for as low a price as possible.  These facts were concealed from the servicer, mortgagee, and HUD.

196.    On or about June 11, 2015, the date of the closing, Co-Conspirator 8 signed, for the purchaser Zor Equities, LLC, a HUD-1 Settlement Statement, which was sent to the mortgagee. On the HUD-1, Co-Conspirator 8 and Zor Equities, LLC falsely represented that Seller 8 received no payments in the sale.

197.    Also on or about June 11, 2015, the date of closing, Co-Conspirator 8 of My Ideal Property Rockaway LLC signed a HUD Closing Worksheet, as broker for the seller, which was also sent to the mortgagee.  On the HUD Closing Worksheet, Co-Conspirator 8 and My Ideal Property Rockaway LLC falsely certified that Seller 8 received no payments in the sale, and that

"there are no hidden terms or special understandings with the buyer, seller, appraiser, closing agent or mortgagee."

198.    In reality, as described above, Seller 8 received payments that were not disclosed to the servicer, mortgagee, or HUD.

199.    As a result of the short sale, Zor Equities, LLC, a corporation owned by Aronov, acquired the property in the short sale for $528,000, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage.  My Ideal Property Rockaway LLC also received $31,680 in broker commissions from the sales price.

200.    On or about March 7, 2016, Co-Conspirator 5 signed, as both the purchaser and as "sole member" of the seller, Zor Equities LLC, a bargain and sale deed transferring the property to himself.

201.    On or about June 15, 2016, Co-Conspirator 5 signed a bargain and sale deed conveying the property to 1021 B Holdings LLC, a company owned or controlled by Aronov. 1021 B Holdings LLC has owned the property through the present date.

202.    On or about May 9, 2016 and February 6, 2017, the mortgagee submitted claims to HUD for insurance payment.  On or about August 21, 2016 and October 8, 2017, HUD paid $598,704.54 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

**VIII.   391 Montauk Ave, Brooklyn, New York 11208**

203.    Defendants Aronov, Konstantinovskiy, Bert Holdings LLC, MI 1 Holdings LLC, and National Homeowners Assistance (the "391 Montauk Defendants"), and other co-conspirators engaged in a fraudulent short sale of 391 Montauk Ave, Brooklyn, New York 11208.  The short sale closed on or about August 27, 2015 for the sales price of $261,000.  As a result of the short

sale, Bert Holdings LLC, a company owned by Aronov, obtained the property for less than fair market value, and the FHA-insured mortgage on the property was released.

204.     On or about August 9, 1999, an individual referred to herein as "Seller 9" took out an FHA-insured mortgage on 391 Montauk Avenue with a principal balance of $228,119.

205.     In or about 2014, the 391 Montauk Defendants contacted Seller 9 and offered him money to sell them 391 Montauk Avenue in a short sale to be coordinated by them.  The 391 Montauk Defendants paid Seller 9 approximately $10,000 in cash at closing of the short sale.

206.     On or about May 29, 2014, Seller 9 signed a "Third Party Authorization and Release Form" authorizing the servicer and mortgagee to speak with and disclose financial records pertaining to his mortgage to Konstantinovskiy and others of National Homeowners Assistance.

207.     Between approximately May 2014 and May 2015, Seller 9 signed multiple contracts for sale of the property to corporate entities that were owned or controlled by Aronov, including MI 1 Holdings LLC and Bert Holdings LLC.

208.     On or about July 2, 2015, the parties to the transaction signed a "Pre-Foreclosure Sale Addendum (FHA-Insured Loan)" that was provided to the servicer and mortgagee, a federally insured financial institution.  The PFS Addendum was signed under penalty of perjury by several individuals, including Seller 9, as purported seller of the property in the short sale; Konstantinovskiy of National Homeowners Assistance as seller's agent, listing agent, and buyer's agent; and Co-Conspirator 5 on behalf of the buyer, Bert Holdings LLC, a company controlled by Aronov.

209.     The signatories acknowledged the materiality of the statements in the Affidavit, representing that "[e]ach signatory understands, agrees and intends that the Mortgagee is relying upon the statements made in this PFS Addendum as consideration for reducing the payoff amount

of the Mortgage and agreeing to the sale of the Property"; and "[e]ach signatory certifies that all the information stated herein, as well as any information provided in connection with pursuing and completing this Pre-Foreclosure Sale, is true and accurate.  HUD will prosecute false claims and statements.  Conviction may result in criminal and/or civil penalties.  (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729 and 3802)."

210.    Nevertheless, the signatories made several materially false or misleading representations in the PFS Addendum, including that: (i) "[t]he sale of the Property is an arm's length transaction, between Seller(s) and Buyer(s) who are unrelated and unaffiliated by family, marriage, or commercial enterprise"; (ii) "[a]dditionally, the transaction is characterized by a selling price and other conditions that would prevail in an open market environment"; (iii) "there are no hidden terms or special understandings that exist between any of the parties involved in the transaction including, but not limited to the buyer, seller, appraiser, broker, sales agent (including, but not limited to the listing agent and buyer's agent), closing agent and mortgagee"; (iv) "[a]ny relationship or affiliation by family, marriage, or commercial enterprise to the Seller(s) or Buyer(s) by other parties involved in the sale of the Property has been disclosed to the Mortgagee"; (v) "[n]either the Seller(s) nor the Buyer(s) will receive any funds or commissions from the sale of the Property except that the Seller(s) may receive an incentive or relocation payment from the Mortgagee.  If that payment occurs at the closing of the sale of the Property, the HUD-1 Settlement Statement will reflected [sic] such payment"; (vi) "[a]ll amounts to be paid to any person or entity, including holders of other liens on the Property, in connection with the Pre-Foreclosure Sale have been disclosed to and approved by the Mortgagee and will be reflected on the HUD-1 Settlement Statement"; and (vii) "[t]he Listing Agent and Listing Broker certify that the subject property was

initially listed in the Multiple Listing Service (MLS) for at least 15 calendar days before any offers were evaluated."

211.    These representations were false, including because the 391 Montauk Defendants made undisclosed payments to Seller 9 to participate in the short sale; and the purported agent for Seller 9 was in a common commercial enterprise with the owner of the shell company buyer (Aronov), in which he conspired to sell the property to Aronov's shell company in the short sale for as low a price as possible.  These facts were concealed from the servicer, mortgagee, and HUD.

212.    On or about July 21, 2015, the servicer approved a short sale to Bert Holdings LLC, an entity controlled by Aronov, for the sales price of $261,000.  The approval was contingent upon several conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer.

213.    On or about August 27, 2015, the date of closing, Co-Conspirator 5 signed, for the purchaser Bert Holdings LLC, a HUD-1 Settlement Statement, which was sent to the mortgagee. On the HUD-1, Co-Conspirator 5 and Bert Holdings LLC falsely represented that Seller 9 received no payments in the sale.

214.    In reality, as described above, Seller 9 received payments that were not disclosed to the servicer, mortgagee, or HUD.

215.    As a result of the short sale, Bert Holdings LLC, a corporation owned by Aronov, acquired the property in the short sale for $261,000, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage.  Konstantinovskiy also received $15,660 in broker commissions from the sale proceeds.

216.    On or about September 23, 2015, the mortgagee submitted claims to HUD for insurance payment.  On or about February 28, 2016, HUD paid $300,910.45 in insurance proceeds

to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

217.    Bert Holdings LLC has owned the property through the present date.

**IX.    997 Clarkson Avenue, Brooklyn, New York 11212**

218.    Defendants Borovinsky, Konstantinovskiy, and Etuy Equities LLC (the "997 Clarkson Defendants"), and other co-conspirators engaged in a fraudulent short sale of 997 Clarkson Avenue, Brooklyn, New York 11212.  The short sale closed on or about September 11, 2015 for the sales price of $228,000.  As a result of the short sale, Borovinsky, through his company Etuy Equities LLC, acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

219.    On or about September 24, 2001, an individual referred to herein as "Seller 10" took out an FHA-insured mortgage on 997 Clarkson Avenue with a principal balance of $186,754.

220.    In or about early 2014, the 997 Clarkson Defendants contacted Seller 10 and offered him money to sell them 997 Clarkson Avenue in a short sale to be coordinated by them.  The 997 Clarkson Defendants paid Seller 10 approximately $16,600 in cash at the closing of the short sale.

221.    On or about February 25, 2014, Seller 10 signed a "Third Party Authorization and Release Form" authorizing the servicer and mortgagee to speak with and disclose financial records pertaining to Seller 10's mortgage to Konstantinovskiy and others of National Homeowners Assistance.

222.    Between approximately March 2015 and May 2015, Seller 10 signed multiple contracts for sale of the property to corporate entities that were owned or controlled by Borovinsky, including 997 Clark Inc. and Etuy Equities LLC.

223.    On or about September 11, 2015, the date of closing of the short sale, the parties to the transaction signed a "Pre-Foreclosure Sale Addendum" that was provided to the servicer and

mortgagee. The Addendum was signed under penalty of perjury by several individuals, including Seller 10, as purported seller of the property in the short sale; Konstantinovskiy, as seller's agent, listing agent, and buyer's agent; and Borovinsky, as "sole member" of the buyer, Etuy Equities LLC.

224. The signatories acknowledged in the Addendum that: "This Pre-Foreclosure Sale Addendum 'Addendum' is given by the Seller(s), Buyer(s), Agent(s), and Facilitator/Negotiator to the Mortgagee of the mortgage loan secured by the Property ("Mortgage") in consideration for the mutual and respective benefits to be derived from the pre-foreclosure sale of the Property."

225. Nevertheless, the signatories made several materially false or misleading representations in the Addendum, including that: (i) "[t]he sale of the Property is an arm's length transaction, between Seller(s) and Buyer(s) who are unrelated and unaffiliated by family, marriage, or commercial enterprise"; (ii) "[a]dditionally, the transaction is characterized by a selling price and other conditions that would prevail in an open market environment"; (iii) "there are no hidden terms or special understandings that exist between any of the parties involved in the transaction including, but not limited to the buyer, seller, appraiser, broker, sales agent (including, but not limited to the listing agent and buyer's agent), closing agent and mortgagee"; and (iv) "[a]ny relationship or affiliation by family, marriage, or commercial enterprise to the Seller(s) or Buyer(s) by other parties involved in the sale of the Property has been disclosed to the Mortgagee."

226. These representations were false, including because the 997 Clarkson Defendants made undisclosed payments to Seller 10 to participate in the short sale; and the purported agent for Seller 10 (Konstantinovskiy) was in a common commercial enterprise with the owner of the shell company buyer (Borovinsky), in which he conspired to sell the property to Borovinsky's

shell company in the short sale for as low a price as possible.  These facts were concealed from the servicer, mortgagee, and HUD.

227.    On or about September 11, 2015, the date of the closing, Borovinsky signed for the purchaser, Etuy Equities LLC, a HUD-1 Settlement Statement, which was sent to the mortgagee. On the HUD-1, Borovinsky and Etuy Equities LLC falsely represented that Seller 10 received no payments in the sale.

228.    In reality, as described above, Seller 10 received payments that were not disclosed to the servicer, mortgagee, or HUD.

229.    As a result of the short sale, Etuy Equities LLC, a corporation owned by Borovinsky, acquired the property in the short sale for $228,000, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage.  Konstantinovskiy also received $13,680 in broker commissions from the sale proceeds.

230.    On or about November 19, 2015 and May 16, 2016, the mortgagee submitted claims to HUD for insurance payment.  On or about December 3, 2015 and September 19, 2016, HUD paid $176,176.95 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

231.    Etuy Equities LLC has owned the property through the present date.

**X.    30 Melba Court, Brooklyn, New York 11229**

232.    Defendants Aronov, 752 Management LLC, BNE Management LLC, and My Ideal Property Rockaway LLC (the "30 Melba Defendants"), and other co-conspirators engaged in a fraudulent short sale of 30 Melba Court, Brooklyn, New York 11229.  The short sale closed on or about May 6, 2016 for the sales price of $115,500.  As a result of the short sale, Aronov, through his company BNE Management LLC, acquired the property for less than fair market value, and the FHA-insured mortgage on the property was released.

233.    On or about August 1, 2003, an individual referred to herein as "Seller 11" took out an FHA-insured mortgage on 30 Melba Court with a principal balance of $182,141.

234.    In or about 2015, the 30 Melba Defendants contacted Seller 11 and offered her compensation to sell them 30 Melba Court in a short sale to be coordinated by them.  The 30 Melba Defendants paid off approximately $20,000 of credit card debt owed by Seller 11, and paid Seller 11 an additional approximately $2,000 in cash at closing.

235.    Between approximately August 2015 and November 2016, Seller 11 signed multiple contracts for sale of the property to corporate entities that were owned or controlled by Aronov, including 752 Management LLC and BNE Management LLC.

236.    On or about January 27, 2016, the parties to the short sale signed a "Pre-Foreclosure Sale Addendum" provided to the servicer and mortgagee, a federally insured financial institution. The Addendum was signed under penalty of perjury by several individuals, including Seller 11, as purported seller of the property in the short sale; Co-Conspirator 8 of My Ideal Property Rockaway Blvd LLC, as listing agent, buyer's agent, listing broker, and buyer's broker; and Co-Conspirator 6, a My Ideal Property agent, on behalf of the buyer, BNE Management LLC, a company controlled by Aronov.

237.    The signatories acknowledged in the Addendum that: "This Pre-Foreclosure Sale Addendum 'Addendum' is given by the Seller(s), Buyer(s), Agent(s), and Facilitator/Negotiator to the Mortgagee of the mortgage loan secured by the Property ("Mortgage") in consideration for the mutual and respective benefits to be derived from the pre-foreclosure sale of the Property."

238.    Nevertheless, the signatories made several materially false or misleading representations in the Addendum, including that: (i) "[t]he sale of the Property is an arm's length transaction, between Seller(s) and Buyer(s) who are unrelated and unaffiliated by family, marriage,

or commercial enterprise"; (ii) "[a]dditionally, the transaction is characterized by a selling price and other conditions that would prevail in an open market environment"; (iii) "there are no hidden terms or special understandings that exist between any of the parties involved in the transaction including, but not limited to the buyer, seller, appraiser, broker, sales agent (including, but not limited to the listing agent and buyer's agent), closing agent and mortgagee"; (iv) "[a]ny relationship or affiliation by family, marriage, or commercial enterprise to the Seller(s) or Buyer(s) by other parties involved in the sale of the Property has been disclosed to the Mortgagee"; (v) "[n]either the Seller(s) nor the Buyer(s) will receive any funds or commissions from the sale of the Property except that the Seller(s) may receive a payment if it is offered by the Mortgagee, and, if the payment is made at closing of the sale of the Property, reflected on the HUD-1 Settlement Statement"; and (vi) "[a]ll amounts to be paid to any person or entity, including holders of other liens on the Property, in connection with the pre-foreclosure sale have been disclosed to and approved by the Mortgagee and will be reflected on the HUD-1 Settlement Statement."

239.   These representations were false, including because the 30 Melba Defendants made undisclosed payments to Seller 11 to participate in the short sale; and the purported agent for Seller 11 (Co-Conspirator 8) was in a common commercial enterprise with the owner of the shell company buyer (Aronov), in which he conspired to sell the property to Aronov's shell company in the short sale for as low a price as possible.  These facts were concealed from the servicer, mortgagee, and HUD

240.   On or about May 6, 2016, the date of the closing, Co-Conspirator 6 signed, for the purchaser BNE Management LLC, a HUD-1 Settlement Statement, which was sent to the mortgagee.  On the HUD-1, Co-Conspirator 6 and BNE Management LLC falsely represented that Seller 11 received no payment in the sale.

241.    In reality, as described above, none of the payments made to or on behalf of Seller 11 were disclosed to the servicer, mortgagee, or HUD.

242.    As a result of the short sale, BNE Management LLC, a corporation owned by Aronov, acquired the property in the short sale for $115,500, which did not reflect fair market value, and the mortgagee released the FHA-insured mortgage.  Co-Conspirator 8 also received $13,680 in broker commissions from the sale proceeds.

243.    On or about June 8, 2017 and January 19, 2018, the mortgagee submitted claims to HUD for insurance payment.  On or about July 23, 2017 and June 21, 2018, HUD paid $159,119.42 in insurance proceeds to the mortgagee, covering the difference between the short sale proceeds and the mortgage balance, as well as approved costs and expenses, and interest.

<u>**CLAIMS FOR RELIEF**</u>

**CLAIM I: TREBLE DAMAGES AND CIVIL PENALTIES UNDER THE FCA**
**(31 U.S.C. § 3729 (a)(1)(A), (B), & (C))**

244.    Each of the foregoing allegations of this Complaint are realleged as if fully set forth in this paragraph.

245.    Defendants, in connection with their fraudulent short sale schemes in which they made fraudulent representations designed to induce HUD to pay FHA-insurance claims, have engaged in a continuous practice of: (a) knowingly presenting, or causing to be presented, false and fraudulent claims for payment and approval to an officer, employee, or agent of the United States or to a contractor, grantee, or other recipient of funds provided or reimbursed by the United States Government; (b) knowingly making, using, and causing to be made and used, false records and statements material to a false or fraudulent claim; and (c) conspiring to defraud the Government by presenting or causing to be presented false and fraudulent claims, and conspiring

to make, use, or cause to be made and used, false records and statements material to a false or fraudulent claim.

246. For each violation of 31 U.S.C. § 3729, Defendants are liable for civil penalties of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101-410, plus three times the amount of damages sustained by the Government because of Defendants' acts.

## CLAIM II: FIRREA CIVIL MONEY PENALTIES PREDICATED ON FALSE STATEMENTS WITHIN THE JURISDICTION OF THE UNITED STATES (12 U.S.C. § 1833a; 18 U.S.C. § 1001)

247. Each of the foregoing allegations of this Complaint are realleged as if fully set forth in this paragraph.

248. In connection with their fraudulent short sale schemes, Defendants committed violations of 18 U.S.C. § 1001 affecting a federally insured financial institution.

249. In connection with each fraudulent short sale scheme, Defendants knowingly and willfully made materially false, fictitious, or fraudulent statements or representations within the jurisdiction of the executive branch of the United States Government, including in PFS Addendums executed in the short sales. Defendants' false and fraudulent statements were often made to federally insured financial institutions that owned or serviced the mortgagees, which were affected by Defendants' fraudulent conduct.

250. For each violation of 18 U.S.C. § 1001, Defendants are liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(1), (2), (3)(A).

## CLAIM III: FIRREA CIVIL MONEY PENALTIES PREDICATED ON
## WIRE FRAUD
## (12 U.S.C. § 1833a; 18 U.S.C. § 1343)

251.    Each of the foregoing allegations of this Complaint are realleged as if fully set forth in this paragraph.

252.    In connection with their fraudulent short sale schemes, Defendants committed violations, or conspired to commit violations, of 18 U.S.C. § 1343 affecting a federally insured financial institution.

253.    In connection with each fraudulent short sale, Defendants engaged in a scheme to defraud and obtain money by false or fraudulent representations in which they knowingly made, or conspired to make, materially false and misleading representations and omissions of material fact to mortgagees (including federally insured financial institutions) and HUD, including in transactional documents for the short sales.

254.    Defendants knowingly used or caused to be used interstate wires as part of their scheme to defraud when they made or caused to be made interstate wire transfers of funds or interstate facsimile or electronic communications in connection with the transactions.

255.    For each violation of 18 U.S.C. § 1343, Defendants are liable for civil penalties up to the maximum amount authorized under FIRREA, 12 U.S.C. § 1833a(b)(1), (2), (3)(A).

* * *

WHEREFORE, the United States respectfully requests judgment against Defendants for treble damages and civil penalties under the FCA and/or civil penalties under FIRREA, together with pre- and post-judgment interest and all allowable costs and attorneys' fees; and for any other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial for all issues so triable.

Dated: Brooklyn, New York         SETH D. DuCHARME
       December 17, 2020         ACTING UNITED STATES ATTORNEY
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201

                    By:   <u>/s/ Michael J. Castiglione</u>
                             Michael J. Castiglione
                             Assistant United States Attorney
                             Tel: (718) 254-7533
                             Michael.Castiglione@usdoj.gov